PeaRSON, O. J.
 

 The exception for, that the comissioner
 
 *381
 
 Ras charged the defendant with' $1560, the snm placed by ■slave, Milly, in the hands of Thomas
 
 T).
 
 Johnson, is allowed. This is not a debt dne to the testator, and the executor had <no means of collecting it,-either at Law or in Equity. If the dealing of the slave was lawful, that, of course, ends the matter, so far as the executor of the former master is concerned. If it was unlawful, as against the policy of the law, neither a court of Equity or of Law will aid in the matter; so the executor could not have collected the fund which Milly had been permitted to accumulate.
 

 Iiow the question will be as between the trustee, Roane, and Johnson, who has executed to him his bond for the amount, this Court is not now at liberty to decide. It differs from the case of
 
 White
 
 v. Cline, 7 Jones’ Rep. 174, in two important particulars: In that case,
 
 the dome earned the money in the State of California.
 
 In this, it was earned in
 
 North Carolina:
 
 So it may be a question, whether the dealing does not come within the mischief intended to be prevent-de by our statutes, forbidding slaves from hiring their own time, or being allowed to go about and work, or not work, as they see proper.
 

 In that case, the money was under the
 
 control of the master,
 
 and the Court say “ as long as the -master keeps the actu■al, as well as the legal control of the fund, it can no more en'danger the public .safety, than any other portion of his property.” In this, the fund is in the hand of a stranger, and ■neither the former master, or his personal representative, or, ■as we presume, the present owner of the slave has any control over the fund.
 

 This Court has, in several cases, not only recognized the •fight of a master, but treated it as commendable, to adopt a system of rewards, 'by which a slave is allowed a half, or a whole day, every time “ the crop is gone over,” to work a
 
 patch
 
 of
 
 cotton,-corn
 
 or
 
 watermelons
 
 and the like, and to sell the proceeds, -so as to make a little money with which to ■buy small amounts of luxuries — sugar, coffee, tobacco, &c., ..and to indulge.a fancy for “finery in dress,” for which the
 
 *382
 
 African race is remarkable; but when it comes to an accumulation of $1500, the question is a very different one, and other considerations are suggested.
 

 The privileges allowed a slave, in order to enable him to acquire that amount of money, extra, must, necessarily, in some degree, run counter to the policy of the statutes by which slaves are not to be allowed to hire or to have the use of their own time. The evil effects of allowing them to own property, such as hogs, cattle, &c., which induced the statute, Rev. Code, chap. 87, sec. 20, by which the property is forfeited to the wardens of the poor, apply, in some degree, to so large a sum of money invested on interest, and is certainly calculated to make other slaves dissatisfied, because they are not allowed the same degree of freedom and privilege, and should such a thing often occur, it would give rise to a kind of trust, of which the courts of Equity cannot take notice and enforce; see
 
 Barker
 
 v.
 
 Swain,
 
 4 Jones’ Eq. 220. So, it would depend on the honesty, of the particular individual in whose hands the funds were placed, either to let the slave have the fund or to dispose of it as he might direct, or according to his will or dying request, or appropriate it to himself. Transactions leading to such results, are certainly not calculated to promote good morals, and should the evil become one of common occurrence, may call for some legislative enactment.
 

 Pee Oukiam, Exception allowed.